# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 20, 2009　　　　　　Decided May 8, 2009

No. 06-1426

ALCOA INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*David R. Poe* argued the cause for petitioner. With him on the briefs were *Sonia C. Mendonca* and *Brett A. Snyder*.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: SENTELLE, *Chief Judge*, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The newly created Electric Reliability Organization proposed that its costs be allocated according to a method of computation called net energy for load. Alcoa asks us to review the decision of the Federal Energy Regulatory Commission that approved the proposal. We find the decision reasonable and thus deny the petition for review.

**I.**

Until recently, the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards. In 2005, Congress decided this arrangement was no longer acceptable and enacted legislation requiring the development of mandatory, FERC-approved electric reliability standards. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1211(b), 119 Stat. 594, 942; Mandatory Reliability Standards for the Bulk-Power System, 72 Fed. Reg. 16,416, 16,419 (Apr. 4, 2007). To carry out this change, Congress added section 215 to the Federal Power Act (FPA), which provides for the creation of a national Electric Reliability Organization charged with establishing and enforcing such standards. 16 U.S.C. § 824o(a)(2) (2006). Any entity may apply, but FERC can certify only one Electric Reliability Organization. Before doing so, the Commission must determine that the applicant meets certain criteria. *See id.* § 824o(c). Relevant here is the requirement that the entity certified, in order to fund its activities, have rules in place that "allocate equitably reasonable dues, fees, and other charges among end users [of the bulk-power system]." *Id.* § 824o(c)(2)(B).

On February 17, 2006, FERC issued Order No. 672 to implement section 215. Among other things, the order clarifies what an entity must do to qualify as the national

Electric Reliability Organization and the methods it may employ to distribute its costs among customers of electric energy. Rules Concerning Certification of the Electric Reliability Organization (Order No. 672), 71 Fed. Reg. 8662 (Feb. 17, 2006). With regard to cost allocation, the preamble to Order No. 672 focuses on "net energy for load." Net energy for load allocates costs on the basis of energy consumption alone, and the Commission agreed with the majority of commenters that this "is one fair, reasonable and uncomplicated method," *id.* at 8665; *see also id.* at 8682. The Commission declined, however, to "rule out other apportionment methods that can be shown to be just and reasonable." *Id.* at 8665. It did not require any particular formula but instead allowed the applicant "flexibility" in deciding which cost allocation method to propose. *Id.* at 8682. The actual regulations that resulted from this rulemaking provide that "[a]ny person who submits an application for certification as the Electric Reliability Organization shall include in its application a formula or method for the allocation and assessment of [its] dues, fees and charges." 18 C.F.R. § 39.4(a) (2008).

On April 4, 2006, the North American Electric Reliability Corporation (NERC) sought certification as the nation's Electric Reliability Organization. It was the sole applicant. Historically, NERC had operated as a voluntary reliability organization that issued nonbinding guidelines and operational standards for the bulk-power system. It had been funded by assessments to its members based on net energy for load, and its application proposed to use this method for apportioning the costs of its services as the Electric Reliability Organization. *See* J.A. at 81 (Request for Certification). Alcoa intervened and objected to NERC's use of the net energy for load method, arguing that the method departs from FERC's ratemaking precedent and would inequitably distribute

NERC's costs among electric energy customers. Alcoa proposed that NERC employ a cost allocation method that, like FERC's traditional transmission rate structure, accounts for capacity-related costs in addition to operating costs. *See* J.A. at 117–20 (Motion to Intervene).

FERC disagreed. It determined that NERC's proposal to allocate costs on the basis of net energy for load satisfied the requirement that the applicant have rules in place that equitably allocate its costs among electric energy users. *See* Order Certifying North American Electric Reliability Corporation as the Electric Reliability Organization (Certification Order), 116 F.E.R.C. ¶ 61,062, at 61,318 (2006). The Commission saw Alcoa's challenge to the net energy for load method as "an impermissible collateral attack on Order No. 672." *Id*. Alcoa's challenge, FERC reasoned, should have been directed at Order No. 672 and was therefore untimely at the certification stage. Accordingly, FERC declined to revisit its earlier conclusion that net energy for load is fair and reasonable. *Id*. Finding that the application met all other statutory requirements, FERC certified NERC as the nation's first Electric Reliability Organization.

Alcoa sought rehearing, repeating its argument that acceptance of the net energy for load method would represent an unjustified departure from established ratemaking precedent. J.A. at 227–32 (Request for Rehearing). FERC, however, was unmoved from its position that Alcoa's argument was an untimely collateral attack, explaining that Order No. 672 "ruled that if the . . . Applicant proposed to allocate funding based on net energy for load it would be a fair and reasonable method." Order on Petitions for Rehearing and Clarification (Rehearing Order), 117 F.E.R.C. ¶ 61,126, at 61,665 (2006). According to FERC, its decision not to select the net energy for load method as the exclusive means

to allocate costs was merely intended to allow applicants the ability to propose different methods. Despite ruling the challenge untimely, FERC nonetheless went on to reject Alcoa's request that NERC abandon the net energy for load method and employ a demand-based approach. FERC determined that Alcoa had failed to demonstrate how the latter could be applied to allocate costs "on a continent-wide basis for NERC funding purposes." *Id.* Alcoa now seeks review in this court.

**II.**

We must first decide whether Alcoa's challenge to the net energy for load method is an untimely collateral attack on Order No. 672 which we lack jurisdiction to consider. Section 313 of the FPA establishes a thirty-day limitations period for "[a]ny person . . . aggrieved by an order issued by the Commission" to apply for rehearing, 16 U.S.C. § 825*l*(a), and a sixty-day limitations period beginning after rehearing to petition for judicial review of the aggrieving order, *id.* § 825*l*(b). A party is aggrieved and may petition for judicial review "if it can establish both the constitutional and prudential requirements for standing," *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2001), including an "actual or imminent, not 'conjectural' or 'hypothetical,'" injury in fact, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

Alcoa did not seek rehearing of Order No. 672 and instead challenged the Commission's subsequent order certifying NERC as the Electric Reliability Organization. The jurisdictional issue—whether this challenge came too late— turns on whether Alcoa was "aggrieved" by Order No. 672. In FERC's view, Order No. 672's endorsement of the net energy

for load method aggrieved Alcoa, and its failure to mount any challenge to that order, let alone a timely one, bars its petition. According to FERC, the Certification Order, which Alcoa did challenge, merely implemented the Commission's previous determination. *See* Br. of Resp't 11–13. Alcoa disagrees. It maintains that it was not "aggrieved" by Order No. 672, which did not actually set a particular cost allocation method for the Electric Reliability Organization. *See* Br. of Pet'r 21; Reply Br. of Pet'r 4–8. In other words, because Order No. 672 did not require the use of net energy for load, the issue of cost allocation on that basis was not yet ripe for review.

We agree with Alcoa. Order No. 672 expressly left open the possibility that the applicant would propose a cost allocation method other than net energy for load. *See* Order No. 672, 71 Fed. Reg. at 8682 ("[O]ur regulations provide[] the ERO applicant the flexibility to propose a formula or method for the allocation and assessment of ERO costs . . . ."); *see also* 18 C.F.R. § 39.4(a). In its wake, Alcoa had reason to think that the applicant might still choose its preferred method of cost allocation. We fail to see how Alcoa was imminently aggrieved by a determination that net energy for load is one of potentially many acceptable methods of cost allocation inasmuch as the order did not foreclose Alcoa's hoped-for outcome. It was only when an applicant actually proposed, and FERC accepted, cost allocation based on net energy for load that Alcoa suffered its alleged harm. That did not occur until the Certification Order. Accordingly, we hold that Alcoa did not suffer any actual or imminent injury as a result of Order No. 672 for which it could have sought review. *Cf. DTE Energy Co. v. FERC*, 394 F.3d 954, 960–61 (D.C. Cir. 2005) (holding that a party cannot seek review of a conditional order that is subject to a further compliance filing because that order has no binding effect and causes no actual injury). Only after the Certification Order could Alcoa

demonstrate a sufficient injury in fact. Alcoa timely sought rehearing and judicial review of this order, and thus our jurisdiction is proper.

**III.**

We turn next to Alcoa's argument that FERC's approval of the net energy for load method constitutes an unexplained departure from established ratemaking precedent. FERC's traditional transmission rate approach is intended to allow service-providing utilities to recover reasonable rates that reflect their costs of providing service. *Second Taxing Dist. v. FERC*, 683 F.2d 477, 480 (D.C. Cir. 1982). Rates must also generally adhere to the principle of "cost causation." "Simply put, it has been traditionally required that all approved rates reflect to some degree the costs actually caused by the customer who must pay them." *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992).

FERC's traditional two-part rate structure, composed of a demand charge and an energy charge, addresses these two principles. *See Town of Norwood v. FERC*, 962 F.2d 20, 21 (D.C. Cir. 1992); *Second Taxing Dist.*, 683 F.2d at 480. The demand component, which incorporates the capacity costs of generation, reflects the fixed investment that load-serving entities must make in order to meet peak customer demand. The energy component incorporates the variable costs of operating and generating electric power. *See Second Taxing Dist.*, 683 F.2d at 480; *see also* MICHAEL A. CREW & PAUL R. KLEINDORFER, THE ECONOMICS OF PUBLIC UTILITY REGULATION 174–78 (1986) (explaining demand-based pricing). "Individual customers' bills are the sum of a demand charge, calculated to reflect the customer's share of demand costs, and an energy charge, calculated to reflect the costs of producing the power used by the customer." *Second Taxing*

*Dist.*, 683 F.2d at 480; *see also La. Power & Light Co.*, 6 F.E.R.C. ¶ 63,031, at 65,186 (1979).

Alcoa argues, and FERC does not dispute, that net energy for load differs from this traditional approach in that it allocates costs among customers on the basis of their energy consumption alone without regard to their demand costs. According to Alcoa, not only does this method depart from FERC's customary approach, but it inequitably distributes the costs of the Electric Reliability Organization among users of the bulk-power system. Because a significant portion of the organization's costs will be demand related, and because net energy for load does not distribute these costs according to each customer's demand-related needs, customers with traditionally low demand charges will be forced to shoulder a greater share of the organization's costs than they would under the traditional two-part rate structure. *See* Br. of Pet'r 23–28; *see also* J.A. at 117–20 (Motion to Intervene).

Our review of this challenge is guided by the arbitrary and capricious standard of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2) (2006); *see also Wash. Gas Light Co. v. FERC*, 532 F.3d 928, 930 (D.C. Cir. 2008). We "affirm the Commission's orders so long as FERC 'examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made.'" *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alterations in original). In matters of ratemaking, our review is highly deferential, as "[i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission." *Town of Norwood*, 962 F.2d at 22; *see also Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003). When an agency

shifts course, however, it "must provide 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" *Entergy Servs.*, 319 F.3d at 541 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

In Order No. 672, the Commission explained that "[m]ost commenters support use of a net energy for load-based funding apportionment," but acknowledged that a few recommended other methods. Order No. 672, 71 Fed. Reg. at 8681. There were two central concerns to consider: the first was the claim that net energy for load would not apportion costs equitably; the second was the issue of "double counting"—charging end users twice for the reliability functions of the organization. *See id.* Reviewing the arguments on both sides, FERC ultimately sided with the majority of commenters. The Commission agreed that net energy for load is "a fair and reasonable" way of allocating costs among end users and concluded that, because it charges based on energy consumed, the possibility of counting energy consumption more than once is minimized. *Id.* In the Certification Order, FERC referred to this discussion in concluding that NERC's proposed use of net energy for load would "allocate equitably reasonable fees and charges among end users." *See* 116 F.E.R.C. at 61,318 ("In Order No. 672, we found that funding apportionment method based on net energy for load is a fair and reasonable method for allocating costs that minimizes the possibility of 'double-counting.'"). Under the highly deferential standard that limits our review, we hold that this decision is neither arbitrary nor capricious.

We also conclude that FERC adequately explained any departure from its traditional two-part transmission rate precedent. As an initial matter, it is not clear to us that the Commission deviated from a prior practice. As explained in

the Rehearing Order and at oral argument, FERC has never used a demand-based transmission rate to allocate the costs of an entity like the Electric Reliability Organization. Charges based on the organization's costs are not transmission rates, and the Commission has not applied its standard rate structure to an entity that would operate on a continent-wide basis. *See* Rehearing Order, 117 F.E.R.C. at 61,665; Oral Arg. Recording at 35:35–:45 (stating that FERC was deciding on a "different kind of rate for a different set of circumstances").

But assuming for the sake of argument that FERC did depart from past precedent, we hold it did so with an explanation that, although admittedly spare, is nonetheless adequate. On rehearing, FERC expressly rejected the idea that its "demand allocation method should be employed for assigning funding responsibility for any of NERC's fixed costs." Rehearing Order, 117 F.E.R.C. at 61,665. It cited the regulation that explains how wholesale transmission rates are calculated, *see id.* at 61,665 n.59 (citing 18 C.F.R. § 35.13(h)(27)), and concluded that Alcoa "fail[ed] to demonstrate how [it] would be appropriate or could be easily developed on a continent-wide basis for NERC funding purposes," *id. See also* Br. of Resp't 21 ("An attempt to apply [demand allocation] to a national rate for all transmission service would be, at best, problematic."). We think this is a sufficient explanation for why the Commission chose not to apply its traditional transmission rate design to allocate the costs of the national Electric Reliability Organization. That the Commission's discussion is styled as a response to Alcoa's argument is of no moment. Alcoa pushed for use of the Commission's traditional two-part transmission rate structure. *See* J.A. at 118 (Motion to Intervene) ("The distinction between demand and energy costs . . . is embedded in the entire fabric of FERC electric regulation," and NERC offers no "basis for deviating from established Commission

policy and precedent."); *see also* J.A. at 229–32 (Request for Rehearing); Br. of Pet'r 25. In rejecting Alcoa's argument on the basis that Alcoa did not demonstrate how this structure would be appropriate, we find it clear that FERC was explaining its departure from its settled rate design policies. Although FERC may not depart from its precedent solely because a petitioner has failed to show why that precedent should apply, that is not the situation we face here.

## IV.

For the foregoing reasons, the petition for review is

*Denied.*