# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 15, 2013        Decided December 13, 2013

No. 12-1008

TC RAVENSWOOD, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ASTORIA GENERATING COMPANY, L.P., ET AL.,
INTERVENORS

Consolidated with 12-1081

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Kenneth L. Wiseman* argued the cause for petitioner TC Ravenswood, LLC. *Robert C. Fallon* argued the cause for petitioner The NRG Companies. With them on the briefs were *Mark F. Sundback*, *Lisa M. Purdy*, *William M. Rappolt*, *J. Peter Ripley*, *Kristine L. Delkus*, *Christopher C. O'Hara*, *Blake R. Urban*, *James M. D'Andrea*, *Marcia A. Stanford*, and *Abraham H. Silverman*.

*Jennifer S. Amerkhail*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Robert M. Loughney* argued the cause for intervenors City of New York and the New York State Public Service Commission. On the brief were *Kevin M. Lang*, *Sean Mullany*, and *Peter McGowan.*

*Kevin M. Lang* and *Neil H. Butterklee* were on the brief for intervenors Consolidated Edison Company of New York, Inc., et al. in support of respondent.

*Shawn Patrick Regan* and *Ted J. Murphy* were on the brief for intervenor New York Independent System Operator, Inc. in support of respondent.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Utilizing administratively determined "demand curves," the New York Independent System Operator (NYISO) holds monthly auctions to set the price of electrical power capacity in New York. Petitioners, owners and operators of electrical power generation facilities, challenge several Federal Energy Regulatory Commission orders concerning the creation of the 2011–2014 demand curves. According to petitioners, the Commission exceeded its statutory authority by suspending NYISO's proposed demand curves for more than five months and acted arbitrarily and capriciously by failing to follow its own precedent requiring only a nominal suspension. Petitioners also challenge several

technical aspects of the proposed curves. For the reasons set forth in this opinion, we deny the petitions for review.

**I.**

The not-for-profit NYISO manages the flow of electricity over New York's electrical grid. One of NYISO's challenges is to maintain an adequate supply of electrical power to meet consumer demand. To accomplish this, NYISO works to ensure that power generators have sufficient incentives to build new power plants when the grid needs additional supply. The cost of power plant construction and fluctuations in price and consumer demand complicate this task. Fearing that unexpected decreases in price or demand might thwart cost recovery, power generators may forgo desirable investment in new generation. If needed development fails to occur, supply will eventually dip below demand, leaving consumers in the dark.

NYISO utilizes monthly capacity auctions to reduce such uncertainties and encourage desirable investment. Unlike the electricity market, in which generators sell actual power to retailers, the capacity market trades in the *future* supply of electrical power. NYISO's capacity market encourages infrastructure investment by linking the price of capacity to the price needed to recoup the cost of building a hypothetical new "peaker" power plant, i.e., a plant that operates only in times of high demand.

Here's how it works. Capacity suppliers bid a quantity of capacity into the auction, and the total amount of capacity bid creates a supply curve, which intersects with a predetermined demand curve. The intersection of the two curves establishes the available quantity of capacity and the price for this capacity. *See Electricity Consumers Resource Council v. FERC*, 407 F.3d 1232, 1235–36 (D.C. Cir. 2005) (describing

4

use of demand curves in capacity auctions). Power retailers then purchase capacity at that price. In theory, this market design encourages desirable investment by signaling the need for more generation and by enabling power generators to recoup their costs in the capacity market.

Pursuant to its Market Administration and Control Area Services Tariff, NYISO files new demand curves with the Commission every three years. The curve-design process focuses on estimating the "cost of new entry" for a hypothetical new peaker plant. In Commission lingo, this requires calculating the "localized levelized cost per kW-month to develop a new peaking unit with energy and ancillary services revenues subtracted." *See New York Independent System Operator, Inc.* ("*January Order*"), 134 FERC ¶ 61,058, at P 6 (2011). In plain English, the cost of new entry equals the hypothetical plant's total cost of producing a unit of electricity—the cost of constructing and operating a plant divided by its expected lifetime energy output—minus what the plant will receive for selling this electricity. Because curves are set for three years, NYISO also establishes an "escalation factor," which it uses to adjust the curves each year for inflation.

In November 2010, NYISO filed its 2011–2014 demand curves (the "Proposed Curves") with the Commission. The Proposed Curves were to take effect in the May 2011 auction following expiration of the then-in-effect curves on April 30, 2011 (the "Preexisting Curves"). Relevant to this appeal, the Proposed Curves excluded the cost of property taxes from the cost of new entry, included a 1.7% escalation factor based on a general inflation index, and estimated the energy and ancillary services revenues ("E&AS revenues") using a regression model based on three years of data.

On January 28, 2011, the Commission approved the escalation factor and E&AS revenues estimate but found the property tax exclusion unreasonable. *January Order*, 134 FERC ¶ 61,058 at PP 88–90, 136, 150. Believing that the Proposed Curves might not be "just and reasonable" as required by section 205(a) of the Federal Power Act, 16 U.S.C. § 824d(a), the Commission exercised its section 205(e) authority to suspend the proposed rates for up to five months, *id.* § 824d(e), and suspended the Proposed Curves "for five months, to become effective the earlier of June 28, 2011, or a date set by a subsequent Commission order." *January Order*, 134 FERC ¶ 61,058 at P 168. The order also directed NYISO to make a further compliance filing to correct the problems identified in the order, *id.* at P 1, and to inform the Commission of "the date it anticipates implementing the new demand curves," provided such "date should be no later than November 1, 2011," *id.* at P 168. "[T]he currently effective demand curves," the order concluded, "will remain in effect until superseded." *Id.* at P 168.

In response, NYISO asked the Commission whether it should apply an escalation factor to the "currently effective demand curves" during the suspension period, and several petitioners sought rehearing of the Commission's imposition of the maximum five-month suspension period. Rejecting both requests, the Commission ruled that the January Order "clear[ly] and unambiguous[ly]" did not provide for escalation, and justified the suspension length citing the "unique nature and purpose of the rates filed" and the need for market participants to "have the actual re-calculated rates before them when they bid in the ICAP auctions." *New York Independent System Operator, Inc.* ("*Suspension Rehearing Order*"), 134 FERC ¶ 61,178 at PP 16–18 & n. 13 (2011).

NYISO responded with two new filings. In the first, submitted March 28, NYISO sought to "establish that the currently effective ICAP Demand Curves will be in effect as of May 1, 2011 and reflect that they will remain in effect until a date established by Commission order." Compliance Filing to State Currently Effective ICAP Demand Curves, March 28, 2011, Joint Appendix (J.A.) 856. Accepted by the Commission on April 4, this filing enabled the Preexisting Curves to remain in place beyond the end of the suspension period. *See New York Independent System Operator, Inc*. ("*April Order*"), 135 FERC ¶ 61,002 at P 10 (Apr. 4, 2011), *reh'g denied*, 137 FERC ¶ 61,218 (2011). In the second filing, NYISO submitted revised curves that implemented the changes the Commission required in its January Order ("the Compliance Curves").

Petitioners, TC Ravenswood and others with an interest in power generation, sought rehearing on a host of issues. They argued that the Commission's acceptance of NYISO's March 28 filing violated the Federal Power Act because it effectively suspended the Proposed Curves beyond the end of the five-month suspension period. They further challenged the Commission's approval of both the 1.7% escalation factor and the anticipated E&AS revenues estimate. NYISO and other objectors challenged the Commission's decision to account for property taxes in the cost of new entry.

The Commission granted rehearing on the property tax issue but denied the other requests. *See New York Independent System Operator, Inc.* ("*Rehearing Order*"), 135 FERC ¶ 61,170 (2011), *reh'g denied*, 137 FERC ¶ 61,218 (2011). Because New York had just enacted legislation to provide full property tax abatement for new peaking plants, the Commission found that including property taxes in the cost of new entry would no longer be appropriate. *Id.* at P 41–43. On September 15, the Commission accepted NYISO's

Compliance Curves as modified to reflect the grant of rehearing on the property tax issue, *New York Independent System Operator, Inc.*, 136 FERC ¶ 61,192 (2011), and NYISO used the curves in the October auction.

TC Ravenswood and other New York City suppliers now petition for review, challenging the suspension period, as well as the Commission's acceptance of the 1.7% escalation factor, its approval of the E&AS revenues model, and its grant of rehearing on the property tax issue. We address the suspension issues in Part II and the remaining issues in Part III.

## II.

Section 205(e) of the Federal Power Act authorizes the Commission to suspend proposed rates for a maximum of five months. 16 U.S.C. § 824d(e). In *West Texas Utility Co.*, 18 FERC ¶ 61,189 (1982), the Commission announced that it would suspend rates "for only one day instead of the five month maximum in those cases where [its] preliminary analysis indicates that no more than ten percent of the increase appears to be excessive," unless "extraordinary factors indicate that wholesale customers may suffer irreparable harm absent a five month suspension." *Id.* at 61,375. Petitioners contend that the suspension violates both *West Texas* and section 205(e). We review challenges to suspension periods deferentially. Specifically, as we explained in *Exxon Pipeline Co. v. United States*, 725 F.2d 1467, 1473–74 (D.C. Cir. 1984), so long as the Commission's reasons are "in some way relevant to [its] statutory inquiries," *id.* at 1473, we will remand only if the Commission "impos[es] two different suspension lengths in cases that [a]re absolutely indistinguishable" or imposes a suspension length "plainly and absolutely foreclosed" by existing rules or precedent, *id.* at 1474.

We begin with the *West Texas* issue. Recall that the Commission suspended the Proposed Curves for five months, finding "the unique nature and purpose of the rates filed, in contrast to the typical rates at issue in cases where [it had] applied *West Texas*" brought the case within *West Texas*'s "extraordinary factors" exception. *Suspension Rehearing Order*, 134 FERC ¶ 61,178 at P 17 n.13. Further explaining its decision, the Commission noted that "the exact revised [demand curve] prices . . . [could not] be predicted with any certainty" at the time and that "market participants should have the actual re-calculated rates before them when they bid in the ICAP auctions." *Id.* at PP 17–18.

Petitioners argue that because the changes required by the January Order would necessarily produce higher prices than the Proposed Curves, the Commission had no basis for concluding under *West Texas* that the Proposed Curves would be excessively high or that customers would suffer irreparable harm without a maximum suspension. Given this, petitioners assert, *West Texas* required the Commission to impose a nominal suspension.

Petitioners' focus on higher prices rests on the assumption that *West Texas* limits the extraordinary factors exception to circumstances that actually produce higher prices for consumers. But in *West Texas*, the Commission rejected such a limitation. By its own terms, the *West Texas* extraordinary factors exception applies when "*increased revenues do not appear to be excessive*, but other, extraordinary factors indicate that wholesale customers may suffer irreparable harm." *West Texas*, 18 FERC ¶ 61,189 at 61,375 (emphasis added). The Commission's reasons for imposing a maximum suspension in this case—the unique nature of the auction markets and bidders' need for the "actual re-calculated rates"—thus comport with the extraordinary factors exception. Moreover,

effectively acknowledging the reasonableness of the Commission's justification, petitioners agree that affording "bidders access to final rules and rates ahead of auctions [is] beneficial." Pet'rs' Reply Br. 24. Petitioners have thus failed to demonstrate that *West Texas* "plainly and absolutely foreclose[s]" the five-month suspension. *See Exxon Pipeline*, 725 F.2d at 1474.

Petitioners next claim that the Commission acted arbitrarily by ignoring their argument that the Compliance Curves would necessarily exceed the Proposed Curves. The Commission did no such thing. It expressly recognized petitioners' argument, explained its uncertainty regarding its ability to predict final demand curve prices, and relied on a countervailing concern, i.e., that bidders need access to the final curves before bidding in the auction. *See Suspension Rehearing Order*, 134 FERC ¶ 61,178 at PP 17–18.

Finally, petitioners argue that the Commission's decision conflicts with an earlier decision that they claim involved "absolutely indistinguishable" facts. Pet'rs' Reply Br. 23. But because this argument first appears in petitioners' reply brief, it comes too late. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (finding argument raised for first time in reply brief forfeited).

Having concluded that the Commission reasonably imposed the maximum suspension period, we turn to petitioners' alternative argument that the Commission exceeded its section 205(e) authority by effectively suspending the Proposed Rates for longer than the five-month statutory maximum. According to petitioners, the Commission's April Order accepting NYISO's March 28 filing to maintain the then-in-effect curves "until replaced by rates effective on a date set when the Commission acts on NYISO's filing to

comply with the" January Order, *April Order*, 135 FERC ¶ 61,002 at P 10, extended the suspension period beyond five months because it permitted the Preexisting Curves to remain in effect until October 2011, two and a half months after the end of the maximum suspension period.

As both the Commission and intervenor NYISO point out, this argument suffers from an obvious defect: the Commission suspended the rates for only five months and then accepted NYISO's *voluntary* decision to delay implementation of the new curves until approval of the Compliance Curves. At no time did the Commission prohibit NYISO from implementing the Proposed Curves at the end of the suspension period. Petitioners contend that NYISO "needed to submit tariff revisions to implement [the Commission's] directive to enable the [Preexisting Curves] to remain in effect" beyond April 30 when the Preexisting Curves were to expire. Pet'rs' Br. 38. But regardless of whether the Commission required NYISO to make a filing extending the rates beyond April 30, it never directed NYISO to extend the Preexisting Curves beyond the five-month suspension period. The Commission's acceptance of NYISO's voluntary extension complied with section 205(e). *Cf. City of Kaukauna, Wis. v. FERC*, 581 F.2d 993, 996–97 (D.C. Cir. 1978) ("And though the Commission may not withhold a supplier's new rate beyond the maximum statutory suspension period, the Act in no way prevents the supplier from agreeing to defer its operation until later.").

Petitioners question the policy implications of NYISO's postponement of the Proposed Curves. Because petitioners depend on demand curves for their revenue but have no responsibility for filing the curves, if "NYISO, at its sole discretion, can delay implementation of new rates as [the Commission] suggests, public utility generators' rights under FPA Section 205 to a just and reasonable rate would be

usurped by a utility that incurs no financial harm from delay." Pet'rs' Reply Br. 13. Although this concern is understandable, nothing in section 205(e) prohibits the Commission from accepting such a voluntary delay.

Finally, petitioners challenge the Commission's approval of NYISO's March 28 filing that extended the then-in-effect curve values without escalation for the remainder of the suspension period. Because the escalation factor was a component of the Preexisting Curves, they contend, the Commission's decision violates its ban on piecemeal ratemaking—a policy that prohibits altering a single component of a rate without reviewing all rate components. *See Houlton Water Co. v. Maine Public Service Co.*, 55 FERC ¶ 61,037 at 61,110 (1991) (describing piecemeal ratemaking). As the Commission points out, however, the piecemeal ratemaking doctrine is beside the point. The Preexisting Curves expired on April 30 and NYISO's March 28 submission filled this void with a new filing. Because the Preexisting Curves were no longer in effect, the Commission never modified an existing rate.

## III.

Petitioners also challenge three technical aspects of the approved demand curves. We review such challenges under the highly deferential arbitrary and capricious standard, "affirming if the Commission has articulated a 'rational connection between the facts found and the choice made.'" *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 809 (D.C. Cir. 2007) (quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

Petitioners first object to the Commission's approval of NYISO's proposed 1.7% escalation factor, which was based on

a general inflation index, rather than their preferred escalation factor of 7.8%, which they derived from the industry-specific Handy-Whitman Index. The Commission, they contend, not only departed from past precedent approving of the Handy-Whitman Index, but also ignored substantial evidence that the general index was inadequate. The Commission made neither misstep. In the earlier cases petitioners cite, the Commission ruled that the Handy-Whitman Index was *a* reasonable measure of inflation, not *the only* reasonable measure. *See, e.g.*, *PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,090 at P 38 (2009), *reh'g denied* 131 FERC ¶ 61,168 (2010); *ISO New England Inc.*, 131 FERC ¶ 61,065 at PP 136–39, *order on reh'g* 132 FERC ¶ 61,122 (2010). The Commission, moreover, ignored no record evidence. To be sure, petitioners presented some evidence suggesting prices would continue to rise rapidly. *See* Joint Aff. of Richard L. Levitan, Seth G. Parker, and Edward K. Tsikirayi, J.A. 293–95. Against this, the Commission found persuasive NYISO's experts' testimony showing that the Handy-Whitman Index likely overstated future price increases because it failed to account for the then-deepening recession. *See Rehearing Order*, 135 FERC ¶ 61,170 at PP 83–85. In such circumstances, where the Commission weighs competing record evidence, we defer to its reasonable choice, and petitioners have given us no basis for questioning its judgment. *See Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 747 (D.C. Cir. 2001) ("[W]e are not called upon to weigh competing experts' opinions 'as an original matter.'") (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989))).

This principle also dooms petitioners' challenge to the Commission's acceptance of NYISO's E&AS revenues estimate. To estimate these revenues, NYISO's expert, NERA Economic Consulting, predicted future revenues by drawing

statistical inferences from three years of historical data. According to petitioners, this period was too short to predict revenues accurately and NYISO failed to use proper statistical tests to verify the accuracy of the results. But the Commission appreciated the model's shortcomings, *see January Order*, 134 FERC ¶ 61,058 at P 136; *Rehearing Order*, 135 FERC ¶ 61,170 at P 75 (recognizing "that greater variation in the dependent variable . . . may yield more robust econometric estimations"), yet concluded NERA's "approach to developing pricing models [was not] so seriously flawed that it [could not] be relied on for estimating energy and ancillary services revenues," *January Order*, 134 FERC ¶ 61,058 at P 136. The Commission also believed that petitioners' competing approach was unreasonable because it suggested that "energy prices do not respond to changes in supply when demand is fixed," a claim the Commission explained was inconsistent with its own experience. *Rehearing Order*, 135 FERC ¶ 61,170 at P 75. Petitioners have given us no cause to second-guess the Commission's reasonable resolution of this technical question. *See Southwest Airlines Co. v. TSA*, 650 F.3d 752, 756 (D.C. Cir. 2011) (declining to "second-guess" agency determination in "data-poor environment" when any decision "would have required considerable guess work" (internal quotation marks omitted)).

Finally, petitioners challenge the Commission's exclusion of property taxes from the cost of new entry. *See Rehearing Order*, 135 FERC ¶ 61,170 at P 42, *reh'g denied*, 137 FERC ¶ 61,218 at P 33. As explained above, while NYISO's request for rehearing of the January Order was pending, New York passed a new law providing tax exemptions to new power generators. The exemption applies to generators that meet two conditions: (1) the new generating unit's construction costs exceed 30% of the property's taxable assessed value, and (2) the new generating unit has an average annual run time of less than 18

hours per start. *See New York Independent System Operator, Inc.* ("*December Rehearing Order*"), 137 FERC ¶ 61,218 at P 35. Based on this change, the Commission granted NYISO's request to exclude property taxes from the cost of new entry.

According to petitioners, this decision conflicts with *Independent Power Producers of New York* (*IPPNY*), 125 FERC ¶ 61,311 (2008), in which the Commission declined capacity suppliers' request to alter the 2008 demand curves when New York passed a law eliminating a property tax exemption approximately six months after the Commission approved the 2008 curves. S*ee id.* at PP 32–37. But that case differs from this case in a critical respect. In *IPPNY*, no party had petitioned for rehearing on the property tax issue. The suppliers in that proceeding therefore bore the burden of proving the entire rate unreasonable, and the Commission accordingly refused to consider the property tax change in isolation. *See id.* at P 33. Here, by contrast, NYISO did request rehearing on the property tax issue. NYISO therefore had to demonstrate only that the Commission should exclude property taxes from the cost of new entry, and the Commission reasonably considered the property tax change in isolation. This hardly amounts to a "distinction without any difference." Pet'rs' Br. 73.

Nor did the Commission ignore substantial evidence that the hypothetical new peaker plant would fail to satisfy the necessary criteria for the tax exemption. Granting NYISO's rehearing request on the property tax issue, the Commission assumed that the hypothetical new peaker unit would qualify for full tax abatement because the abatement requirements were known upfront and because the legislature's stated intent was to provide tax abatement for peaker units. *See December Rehearing Order,* 137 FERC ¶ 61,218 at P 35. True, the Commission did not examine the hypothetical peaker unit's

construction costs and average annual run time to determine whether it would actually qualify for a property tax abatement. As the Commission points out, however, petitioners offered no evidence that called into question the Commission's assumption that it would. *Id.*

## **IV.**

For the foregoing reasons, we deny the petitions for review.

*So ordered.*