# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 20, 2024          Decided June 14, 2024

No. 23-1192

NEW YORK STATE PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CITY OF NEW YORK, ET AL.,
INTERVENORS

———

Consolidated with 23-1259, 23-1286

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Jeffrey A. Schwarz* argued the cause for petitioner. With him on the briefs were *Scott H. Strauss*, *Amber L. Martin Stone*, and *John J. Sipos*.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Scott R. Ediger*, Attorney Advisor, entered an appearance.

*Paul W. Hughes* argued the cause for intervenor in support of respondent. With him on the brief were *David B. Johnson*, *David G. Tewksbury*, and *Andrew A. Lyons-Berg*.

Before: SRINIVASAN, *Chief Judge*, CHILDS, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* CHILDS.

RANDOLPH, *Senior Circuit Judge*: This is a case about the use of forecasts in the highly regulated electric energy industry. In proposing rates for electricity-generating entities, predictions must be made, by the utilities and by their regulators. If the Federal Energy Regulatory Commission approves the rates proposed, those rates will apply until altered. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127–29 (1990); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962–63 (1986).

## I.

New York Independent System Operator, Inc. is a non-profit entity that operates New York's electric grid and oversees the state's wholesale electricity markets. The System Operator also administers capacity market auctions, at which electricity providers bid for the right to supply electric energy to utilities in the future, if necessary. We described the workings of these auctions in *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 114–15 (D.C. Cir. 2013), and *Electricity Consumers Resource Council v. FERC*, 407 F.3d 1232, 1234–35 (D.C. Cir. 2005).

What matters here is that the market price of capacity at the auctions depends in large part on the System Operator's estimate of the annual net cost of operating a hypothetical gas-fired "peaking plant" in New York State, known as the "cost of new entry." (A peaking plant is a plant that runs only during times of peak demand.) The System Operator derives the cost of new entry by estimating the lifetime cost of a new peaking plant, dividing that by the number of years of the plant's projected economic lifespan, and then subtracting the plant's expected annual revenues.

The plant's expected commercial lifespan, which the System Operator dubs an "amortization period," is key in this case. This metric reflects the number of years over which an investor in a new plant would expect to recover the costs of developing the plant, along with a reasonable return on that investment. Under the System Operator's formula, a shorter expected lifespan increases the annual cost of new entry (because the cost of the plant must be recouped over fewer years) and thus raises the price of capacity at auction.

The System Operator must regularly submit its rate schedule (a tariff) to FERC for approval. *See* 16 U.S.C. § 824d(c). FERC previously approved the System Operator's rate design tying the price of capacity to the annualized cost of a peaking plant. *See Elec. Consumers Res. Council*, 407 F.3d at 1235–39. The System Operator's rate schedule also obliges it to submit to FERC an updated estimate of the cost of new entry every four years. *See* New York Independent System Operator Market Administration and Control Area Services Tariff § 5.14.1.2.2 (2024), https://perma.cc/2QQB-34MC.

In late 2020, the System Operator filed its proposed rates for the 2021–2025 period. In its submission, it shortened the amortization period from the twenty years it had used in prior

filings to seventeen years. The System Operator justified the change by pointing to the recently enacted New York Climate Leadership and Community Protection Act, 2019 N.Y. Sess. Laws ch. 106.

The N.Y. Climate Act, passed in 2019, proclaims that "by the year [2040] . . . the statewide electrical demand system will be zero emissions." N.Y. Pub. Serv. Law § 66-p(2). The Act entrusts implementation of that goal to the petitioner here—the New York Public Service Commission, a state agency that oversees, among other things, the production and distribution of retail gas and electricity in New York. *Id.* § 5(1)(b). By June 30, 2021, the Public Service Commission was to "establish a program to require that" New York achieve the zero-emissions target. *Id.* § 66-p(2). Put otherwise, the Act directs the Commission to promulgate regulations so that by 2040 the production of electricity in New York results in zero carbon emissions.

The N.Y. Climate Act also gives the Public Service Commission some flexibility in implementing the "zero emissions" mandate. The Commission may "modify" regulated entities' "obligations" or the Act's emissions "targets" if needed to preserve "safe and adequate electric service." *Id.* It can also "temporarily suspend or modify" regulatory obligations if it finds that the regulations "impede[] the provision of safe and adequate electric service," are "likely to impair existing obligations and agreements," or are causing a "significant increase in arrears or service disconnections." *Id.* § 66-p(4).

The System Operator asserted that the N.Y. Climate Act's zero-emissions target required decreasing the amortization period. In making this decision, the System Operator claimed that it was not speculating about whether all existing New York fossil-fuel generators would cease operating by 2040, or whether

any new technologies or not-yet-extant Commission regulations would enable fossil-fired plants to continue in some form after 2039. The System Operator instead predicted that achieving zero emissions—however that occurs—"will require evolution of [New York's] resource mix" away from fossil fuels. It thus proposed to use an estimated plant commercial lifespan of seventeen years, the average duration between the beginning of each year in the 2021–2025 period covered by the submission and the N.Y. Climate Act's January 1, 2040 zero-emission deadline.

FERC rejected the System Operator's submission with respect to the proposed amortization period. *N.Y. Indep. Sys. Operator, Inc.*, 175 FERC ¶ 61,012 (2021). It deemed the justification for a seventeen-year commercial lifespan "speculative" given that (1) the N.Y. Climate Act did not expressly require fossil-fuel electricity generators to retire by 2040 and (2) the Act allowed the Public Service Commission to modify the Act's requirements to permit fossil-fuel generators to remain operational beyond that date. *Id.* at P 161. To FERC, the System Operator's "assumption that all fossil-fueled resources will cease operation in 2040" lacked support in the Act. *Id.* The Public Service Commission, FERC emphasized, had not yet promulgated any regulations to implement the N.Y. Climate Act's 2040 deadline.

Independent Power Producers of New York, Inc., a trade association of electricity generators, sought judicial review of FERC's rejection. We granted their petition in an unpublished judgment, holding that FERC failed to sufficiently explain its reasons for rejecting the System Operator's proposal. *Indep. Power Producers of N.Y., Inc. v. FERC*, No. 21-1166, 2022 WL 3210362, at *2–3 (D.C. Cir. Aug. 9, 2022) (per curiam). We observed that FERC's duty in the proceeding was to determine whether the System Operator had shown that its predicted plant

commercial lifespan reflected "a reasonable estimate of the number of years that an investor would expect a gas-fired plant built in New York between 2021 and 2025 to remain commercially viable." *Id.* at *2.

We faulted FERC for putting weight on the Public Service Commission's discretion under the Act to alter the law's requirements and emissions target, since FERC's precedents require it to base rates on "currently effective laws and regulations," rather than on "speculati[on] about laws and regulations in the future." *Id.* at *2 (citing *N.Y. Indep. Sys. Operator, Inc.*, 146 FERC ¶ 61,043, at P 74 (2014)). We also found error in FERC's failure to explain "why [the System Operator's] reading of the [Climate] Act . . . fell outside the zone of reasonableness" afforded to public utilities under the Federal Power Act. *Id.* at *3. Despite rejecting FERC's analysis, we "express[ed] no view" on whether FERC could reach the same decision with a more detailed explanation. *Id.*

On remand, FERC again rejected the System Operator's analysis as "speculative" because the N.Y. Climate Act did not "[o]n its face" require the retirement of all fossil fuel generators by 2040, and because the Public Service Commission had not issued rules mandating that result. *N.Y. Indep. Sys. Operator, Inc.*, 181 FERC ¶ 61,227, at P 26 (2022). FERC concluded that there was no reason to think that the Public Service Commission would "act in a specific way"—namely, require all fossil-fuel generators to shutter—rather than pursuing "other possibilities" such as modifying the emissions target. *Id.* at PP 27, 30.

Independent Power Producers sought rehearing before FERC, *see* 18 C.F.R. § 385.713, which granted its request. This time, FERC approved the System Operator's submission. *N.Y. Indep. Sys. Operator, Inc.*, 183 FERC ¶ 61,130 (2023).

FERC upheld the seventeen-year amortization period as "one reasonable way" to account for the N.Y. Climate Act—even though the zero-emissions target reasonably could be achieved in "more than one way" that might not require retiring all fossil-fueled resources. *Id.* at P 34. FERC noted that the System Operator had cited "multiple risk factors," including uncertainty around the feasibility of technologies to reduce emissions from fossil-fired generators and a lack of instructions on how entities could comply with the target. *Id.* at PP 35–36. Those challenges made it reasonable to "avoid speculating about future technological [or regulatory] development[s]" and instead to interpret the N.Y. Climate Act to create "significant pressure" on peaking plants to retire by 2040. *Id.* Because the projected plant commercial lifespan was just and reasonable, FERC held, so were "the rates that result[ed]" from it. *Id.* at P 37.

The Public Service Commission sought (re-)rehearing before FERC, which was denied. *N.Y. Indep. Sys. Operator, Inc.*, 185 FERC ¶ 61,010 (2023). FERC reaffirmed its stance that seventeen years was a reasonable view of "the period of time that the developer of a hypothetical peaking plant in New York State would reasonably expect to have to recover the costs from its investment, given the zero-emission requirement in the [N.Y. Climate Act]." *Id.* at P 39. The Public Service Commission now petitions for judicial review in this court.

## II.

Under Section 205 of the Federal Power Act, FERC reviews rate schedules filed by public utilities and must approve the rates if the utility demonstrates that they are "just and reasonable."[1] 16 U.S.C. § 824d(a), (e); *TransCanada Power Mktg. Ltd. v.*

---

[1] FERC can also withhold approval if the rates are unduly discriminatory. 16 U.S.C. § 824d(b). That is not at issue here.

*FERC*, 811 F.3d 1, 4 (D.C. Cir. 2015). "[T]here is not a single 'just and reasonable rate'" but rather a "zone of reasonableness," bounded "on one end by investor interest and [on] the other by the public interest against excessive rates." *Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 471 (D.C. Cir. 2008) (per curiam) (citations omitted), *rev'd in part on other grounds sub nom. NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165 (2010); *accord Fed. Power Comm'n v. Conway Corp.*, 426 U.S. 271, 278 (1976).

FERC has construed its Section 205 authority as "limited to an inquiry into whether the [proposed] rates . . . are reasonable," without regard to whether the rates are "more or less reasonable" than other possible rate designs. *City of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984). We have described FERC's role under Section 205 as "essentially passive and reactive"; so long as a utility's rates fit within the zone of reasonableness, FERC is obligated to approve them. *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9–10 (D.C. Cir. 2002) (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 876 (D.C. Cir. 1984) (Scalia, J.)).

Because FERC approved the System Operator's proposal, the question presented in this case is whether FERC reasonably concluded that the seventeen-year amortization period fell within the zone of reasonableness. In resolving this question, we do not write on a clean slate. Our prior judgment vacating FERC's original decision held that the System Operator needed to show that it had chosen a "reasonable estimate" of how long an investor would expect a new gas-fired plant to remain "commercially viable." *Indep. Power Producers*, 2022 WL 3210362, at \*2. We also instructed FERC not to reject the System Operator's submission unless it could "explain why [the System Operator's] contrary reading of the [N.Y. Climate]

Act . . . fell outside the zone of reasonableness." *Id.* at *3 (citing *City of Bethany*, 727 F.2d at 1136).

FERC's ultimate decision to approve the shortened amortization period satisfied those directives. To be sure, FERC's change of heart a mere five months after its initial decision on remand is eyebrow-raising, and we usually view such "flip-flops" in an agency's position with some skepticism. *Bigelow v. Dep't of Def.*, 217 F.3d 875, 878 (D.C. Cir. 2000) (quoting *Akzo Nobel Salt, Inc. v. FMSHRC*, 212 F.3d 1301, 1305 (D.C. Cir. 2000)). In this case, though, the decision on rehearing rightfully focused on whether the System Operator's position "reflect[ed] a reasonable interpretation of the [N.Y. Climate Act]." *N.Y. Indep. Sys. Operator*, 183 FERC ¶ 61,130, at P 34. FERC then appropriately concluded that the proposal fell within the zone of reasonableness.

All that the N.Y. Climate Act requires on its face, as relevant here, is a "statewide electrical demand system" of "zero emissions" by 2040. N.Y. Pub. Serv. Law § 66-p(2). As FERC observed, that open-ended language gives no indication whether each plant must generate zero emissions, or whether zero *net* statewide emissions will suffice (such that renewable resources can effectively cancel out the emissions of fossil fuels). The Act also says nothing about whether fossil-fired plants will have to stop their emissions by shutting down, or whether technological modifications will enable them to stay open while eliminating emissions. The Act's silence on these and other questions means that "zero emissions," without more, admits of no single, definitive meaning.

Our prior judgment highlighted the Public Service Commission's "regulatory inaction" in failing so far to give meaning to, or alter, the Act's mandate. *Indep. Power Producers*, 2022 WL 3210362, at *2. We warned against

relying on "speculation that . . . New York State regulators will act at some point in the future." *Id.* (quoting *N.Y. Indep. Sys. Operator*, 146 FERC ¶ 61,043, at P 74). FERC acted consistently with that reasoning in upholding the System Operator's decision to focus on the Act's default setting (i.e., zero emissions by 2040), and not on "speculat[ion] . . . on how the [Public Service] Commission may or may not implement the zero-emission target." *N.Y. Indep. Sys. Operator*, 183 FERC ¶ 61,130, at P 34 & n.97.

The Act provides no clarity about how exactly New York is to achieve the emissions target. One readily apparent way—if not the only conceivable way—to reach zero emissions is to shut down all energy generators that produce emissions. And even if some plants will need to stay in operation beyond 2039 to preserve electric grid reliability, no rules or express statutory language currently create a framework enabling them to do so. There is also, as FERC put it, a "significant factual dispute" over the feasibility of technologies that could allow plants to convert to the use of non-carbon-emitting fuels and thus stay operative. *Id.* at P 35. Under any view of the Act, then, it seems quite possible that emissions-producing gas-fired plants will experience, at minimum, significant pressure to retire by 2040.

It makes sense that a rational investor could evaluate all the legal and technological uncertainties and predict that a new fossil-fueled plant would not "remain commercially viable" past 2039. *Indep. Power Producers*, 2022 WL 3210362, at *2. Under the terms of our judgment, FERC was therefore obligated to, and rightly did, accept the System Operator's adoption of that reasonable "reading of the Act."[2] *Id.* at *3.

_____

[2] The Public Service Commission was not a party to the first round of litigation in this court. But FERC *was* a party and as such had a duty to comply with our judgment. *See Process Gas Consumers*

11

The Public Service Commission points to the judgment's favorable citation to FERC's anti-speculation precedents, *see id.* at \*2, to assert that our judgment did not authorize making assumptions—even reasonable ones—about how the N.Y. Climate Act would operate. Because the Commission might implement the Act in any number of ways, its argument goes, assuming that it will choose one particular approach (banning all fossil-fired plants) amounts to improper speculation.

But that is not what the System Operator did here. FERC's precedents prohibit speculating about future laws and regulations. *See N.Y. Indep. Sys. Operator, Inc.*, 158 FERC ¶ 61,028, at P 61 (2017); *N.Y. Indep. Sys. Operator*, 146 FERC ¶ 61,043, at P 74. Gazing into a crystal ball to predict how regulators will act, however, is a far cry from considering how rational private markets will assess current laws' probable future effects. In fact, FERC in one of those precedents upheld the System Operator's prior decision to lower the amortization period from thirty to twenty years based on "risks in investing" borne from "tighten[ing]" environmental standards. *N.Y. Indep. Sys. Operator*, 146 FERC ¶ 61,043, at P 117.

FERC rate-setting proceedings inherently require public utilities to make predictions about the future. We have recognized that estimations—even "[l]ong-range estimates"—"are an integral feature of ratemaking." *Town of Norwood v. FERC*, 53 F.3d 377, 380 (D.C. Cir. 1995); *accord, e.g.*, *KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1059 (D.C. Cir. 2003); *Sw. Pub. Serv. Co. v. FERC*, 952 F.2d 555, 556 (D.C. Cir. 1992). The System Operator's rate schedule, for instance, ties rates for each coming four-year period to an "estimat[e]" of "the 'cost of new entry' for a hypothetical new

*Grp. v. FERC*, 292 F.3d 831, 836–40 (D.C. Cir. 2002); *Mobil Oil Corp. v. EPA*, 871 F.2d 149, 150 n.1 (D.C. Cir. 1989).

peaker plant," based on several predicted metrics. *TC Ravenswood*, 741 F.3d at 115. As FERC put it, "the very nature of [the System Operator]'s task . . . requires [it] to make a variety of forward-looking assumptions." *N.Y. Indep. Sys. Operator*, 185 FERC ¶ 61,010, at P 43. Some reliance on reasoned estimation of future conditions—in other words, on speculation—is built into the project of setting rates.

Here, the System Operator had to design its rates in the face of a law that mandates "zero emissions" by 2040 and amid uncertainty about whether or how that aim might be achieved. The System Operator had reason to believe that the "risks in investing" in gas-fired plants had grown because of the N.Y. Climate Act. *N.Y. Indep. Sys. Operator*, 146 FERC ¶ 61,043, at P 117. And it was reasonable for it to conclude that investors in a new fossil-fired plant could expect that the plant would face "significant pressure" to retire by 2040, after which they would no longer be able to make returns on their investments. *N.Y. Indep. Sys. Operator*, 183 FERC ¶ 61,130, at P 36.

The Public Service Commission's contrary view in effect relies on the same error of which it accuses the System Operator. The Commission favors leaving the amortization period unchanged because it could implement the N.Y. Climate Act in a way that keeps some gas-fired plants operative. To the extent that any approach to setting rates here would have required some degree of guesswork, Section 205 of the Federal Power Act (and our prior judgment) required FERC to resolve the matter in favor of the System Operator's reasonable prediction. *See Atl. City Elec. Co.*, 295 F.3d at 9–10.

The Public Service Commission also suggests that the uncertainty should have led the System Operator to ignore entirely the N.Y. Climate Act until the Act's regulatory program is set up. That may well have been a reasonable approach, as

FERC recognized, but it does not render what the System Operator did unreasonable. The precise means by which New York will achieve zero emissions are not yet in place, but both the goal and the deadline are—unless and until the Commission steps in to change them. Investors tend to act on whatever information is publicly available to them at the time. *Cf. Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014). So it was rational for FERC to credit the System Operator's view that investors could adjust their expectations of the likely lifetime of a new peaking plant in response to the Act's dramatic zero-emissions command, even if it remains unclear how exactly the Act will be implemented.[3]

It is ironic that the Public Service Commission objects so strenuously to the System Operator's interpretation of the N.Y. Climate Act. That Act vests in the Commission alone the power to "establish a program" to achieve the zero-emissions target, N.Y. Pub. Serv. Law § 66-p(2), yet the Commission has not issued so much as a proposed rule implementing the Act.[4]

---

[3] Under the Public Service Commission's logic, it would be premature to account for the N.Y. Climate Act even after the initial implementing regulations are issued. Commission members serve six-year terms. N.Y. Pub. Serv. Law § 4(3). So new commissioners will be appointed prior to 2040 and could enact new rules altering what gas-fired plants need to do to reach zero emissions. As a result, the rules are not truly settled until 2040. Yet it seems highly probable—and, at minimum, it would be reasonable to predict—that investors will adjust their expectations well ahead of 2040 in response to changes in the regulatory landscape and energy markets.

[4] The N.Y. Climate Act required the Commission to enact a program by mid-2021. N.Y. Pub. Serv. Law § 66-p(2). The Commission initiated that process only in May 2023 and thus far has been soliciting public comments on how it should proceed. *See Matter Master: 15-01168/15-E-0302*, Dep't of Pub. Serv.,

**III.**

The Public Service Commission makes one other attack on FERC's decision: it claims that FERC failed to justify the increased costs to consumers that would result from shortening the amortization period. By the Public Service Commission's estimate, the System Operator's change will impose upwards of $100 million of additional annual costs on consumers.

FERC admittedly did not do much to address the cost impact of the change. It noted simply that the cost increases were a natural consequence of a projected plant commercial lifespan that FERC had found to be just and reasonable, since the System Operator's rate schedule sets an inverse relationship between the amortization period and the ultimate rates.

Once again, this court's precedents compel upholding FERC's decision. Section 205 is designed to "enabl[e] [a public utility] to increase its rates" so long as it stays within the zone of reasonableness. *City of Winnfield*, 744 F.2d at 875. To that end, FERC "restricts itself to evaluating the confined proposal" without regard to any other options. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017). FERC must accept any proposed rates that are just and reasonable—even if the current rates might already be reasonable or if other optional rate designs might be "more or less reasonable" than the utility's selected rate schedule. *City of Bethany*, 727 F.2d at 1136; *City of Winnfield*, 744 F.2d at 874–75.

---

https://perma.cc/NCQ5-QA46 (last visited June 5, 2024). The Act contemplated that, by July 2024, the program would have been in place long enough to warrant a "comprehensive review" of its progress. N.Y. Pub. Serv. Law § 66-p(3).

Similarly, because Section 205 is "intended for the benefit of the utility" as it seeks to raise rates, the utility need not "prove the continued reasonableness of . . . *unchanged* attributes of its rate structure." *City of Winnfield*, 744 F.2d at 875, 877. Only "those portions of its filing that represent [a] departure from the status quo"—here, the reduced projected commercial lifespan—are subject to review. *Id.* at 877 (quoting *Pub. Serv. Comm'n of N.Y. v. FERC*, 642 F.2d 1335, 1345 (D.C. Cir. 1980)).

As FERC acknowledges, the Public Service Commission can file a separate complaint to argue that the existing rate design is producing rates that are not just and reasonable. 16 U.S.C. § 824e; *see, e.g.*, *N. Va. Elec. Coop. v. FERC*, 945 F.3d 1201, 1204 (D.C. Cir. 2019) (citing *Delmarva Power & Light Co.*, 160 FERC ¶ 61,102, at P 19 (2017)); *Pub. Utils. Comm'n of Cal. v. FERC*, 254 F.3d 250, 257–58 (D.C. Cir. 2001). In the Section 205 proceeding, however, FERC properly did not reexamine the overall rate design and its cost implications once it had approved the new predicted plant lifespan.

\* \* \*

The Public Service Commission's petitions for review are therefore denied.

*So ordered.*

CHILDS, *Circuit Judge*, dissenting: The key to this case is that the N.Y. Climate Act does not impose a single requirement on fossil-fired plants—much less require them to shut down. While the Act sets an emissions target for the state of zero emissions by 2040, its only relevant requirement is for the N.Y. Public Service Commission to someday promulgate regulations to reach that target. If power plants continue to operate past 2040, they will not violate any provision of the Act, and if they shut down, it will not be because any provision of the Act required them to do so. Thus, the Act does not "create 'significant pressure' on peaking plants to retire by 2040," Op. 7, or "require[] . . . a 'statewide electrical demand system' of 'zero emissions' by 2040," Op. 9. Future regulations implementing it may do those things—if and when they are ever promulgated—but the Act itself does not.[1]

The distinction between what is required by the Act and what may be required by its future implementing regulations is crucial: No one disputes that the System Operator may justify its proposed amortization period based on what the Act requires, but an amortization period based on what future implementing regulations may require is difficult to square with FERC's anti-speculation precedent.

That precedent "required [the System Operator] to take into account currently effective laws and regulations and avoid speculating about laws and regulations in the future." *Indep. Power Producers of N.Y., Inc. v. FERC*, 2022 WL 3210362,

---

[1]    There is considerable uncertainty about when, if ever, those regulations will be promulgated given the Commission's failure to comply with the statutorily mandated schedule for promulgating them, *see* Op. 14 n.4, and the Act's caveat that regulations need not be promulgated on schedule if they will "impede[] the provision of safe and adequate electric service," "impair existing obligations and agreements," or cause a "significant increase in arrears or service disconnections." N.Y. PUB. SERV. LAW § 66-p(4).

at \*2 (D.C. Cir. Aug. 9, 2022) ("*IPPNY*") (internal quotation marks omitted). In *Texas Gas Transmission, LLC*, for example, FERC rejected Texas Gas' proposed alterations to the definition of *force majeure* in its tariff as overly speculative. 141 FERC ¶ 61,223 (2012) at PP 13-27. Texas Gas tried to justify the alterations based on a proposed rulemaking by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") that would implement requirements in the Pipeline Safety, Regulatory Certainty and Job Creation Act of 2011. *Id.* at PP 13-14. It argued that the proposed regulations would likely culminate in final regulations implementing that statutory provision. *Id.* at P 20. But FERC rejected that argument because "the nature and timing of any new safety requirements PHMSA may adopt pursuant to the 2011 Act or ongoing PHMSA rulemakings [wa]s too speculative." *Id.* at P 27. More recently, in *Tennessee Gas Pipeline Co., L.L.C.*, FERC held that the N.Y. Climate Act did not undermine a finding of public necessity because "while the Act includes targets and goals [for emissions reductions], it does not prescribe any method or means for meeting these goals." 181 FERC ¶ 61,051 at P 16 (2022). Yet, in the face of this precedent, FERC approved the System Operator's proposed amortization period based on the System Operator's prediction that the N.Y. Climate Act's implementing regulations will require fossil-fired plants to shut down. *N.Y. Indep. Sys. Operator, Inc.*, 183 FERC ¶ 61,130 at PP 31-37 (2023).

The majority attempts to justify FERC's decision in two ways, but neither succeeds.

First, the majority tries to evade the difficulty of reconciling FERC's precedent by collapsing the distinction between what the N.Y. Climate Act and its implementing regulations require. For example, the majority describes the Act as "proclaim[ing] that 'by the year [2040] . . . the statewide

electrical demand system will be zero emissions,'" Op. 4 (quoting N.Y. PUB. SERV. LAW § 66-p(2)), when in fact the Act instructs the Commission to "*establish a program* to require that by the year [2040] . . . the statewide electrical demand system will be zero emissions." N.Y. PUB. SERV. LAW § 66 p(2) (emphasis added). According to the majority, "the N.Y. Climate Act requires . . . a statewide electrical demand system of zero emissions by 2040," leaving uncertainty only as to how plants must carry out that mandate: "whether fossil-fired plants will have to stop their emissions by shutting down, or whether technological modifications will enable them to stay open while eliminating emissions." Op. 9; *see also* Op. 12 ("Here, the System Operator had to design its rates in the face of a law that mandates 'zero emissions' by 2040 and amid uncertainty about whether or how that aim might be achieved."). By characterizing FERC's speculation as relating only to how plants will meet emissions requirements, however, the majority leaps over FERC's speculation about if and when implementing regulations imposing emissions requirements will ever be promulgated.

Second, the majority attempts to reconcile FERC's precedent, and in doing so risks rendering that precedent meaningless. As the majority reads it, FERC's anti-speculation precedent does not prevent the System Operator from justifying its proposed amortization period by "considering how rational private markets will assess current laws' probable future effects," it merely prevents the System Operator and FERC from trying to "predict how regulators will act" by "[g]azing into a crystal ball." Op. 11. Under this reading, it is difficult to see how any prediction would ever be too speculative; speculation about "probable future effects" can always be recharacterized as a prediction based on "current laws" or other current circumstances (barring cases of true magic). I have not seen any caselaw to suggest that speculation about future

regulations would be more reasonable when based on current law as opposed to other current circumstances. And if predictions about "probable future effects"—such as the probable future regulations implementing the N.Y. Climate Act—are valid as long as they are based on current laws or circumstances, then FERC's anti-speculation precedent will essentially always be satisfied. Thus, the majority's reading of FERC's precedent does not distinguish this case from FERC's other anti-speculation cases. *See, e.g.*, *Texas Gas Transmission, LLC*, 141 FERC ¶ 61,223; *Tennessee Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051. Nor can it distinguish this case from *IPPNY*'s holding prohibiting FERC to speculate that the N.Y. Climate Act's provision allowing for state emissions targets to be altered would have the probable future effect of those targets being altered. *See IPPNY*, 2022 WL 3210362, at *2.

Oddly, the majority's citation to *N.Y. Indep. Sys. Operator, Inc.* suggests that the majority itself does not believe that FERC's anti-speculation precedent has teeth. *See* Op. 11 (noting that "FERC . . . upheld the System Operator's prior decision to lower the amortization period . . . based on 'risks in investing' borne from 'tighten[ing]' environmental standards"). The majority does not, however, explain how its view of *N.Y. Indep. Sys. Operator, Inc.* is consistent with FERC's later statement in that same decision that it would not consider "potential upcoming state and federal regulations" that "the U.S. Environmental Protection Agency [wa]s currently considering amending," *id.* at P 65, because it "cannot base [its finding] on speculation that the [Environmental Protection Agency] or New York State regulators will act at some point in the future," *id.* at P 74. If anything, *N.Y. Indep. Sys. Operator, Inc.* highlights FERC's inconsistent application of its anti-speculation precedent.

Because the Public Service Commission identifies unexplained inconsistencies between FERC's precedent and its decision in this case, I would remand to FERC to reconsider the case consistent with its precedent or explain why deviating from that precedent is justified.  Thus, I respectfully dissent.